hWOODARD, J.,
dissenting.
I must respectfully disagree with the majority’s opinion because there is nothing in the record or in the briefs, submitted on appeal, which suggests that these parties sought a determination regarding Ms. Dronet’s right to receive SEB benefits; thus, prescription, as it relates to SEBs, is not before us. As such, any holding on this issue is inappropriate and unnecessary.
On the other hand, the parties, clearly, did expect us to reconcile the issue of whether Ms. Dronet’s claim for TTDs had prescribed. The majority opinion disposed of her claim for TTDs by concluding that the evidence presented could support a finding that her reinjury was nothing more than a gradual deterioration resulting from her job duties as a cashier and not an aggravation of her condition from an actual, identifiable, precipitous event.
However, the evidence is contrary to the majority’s finding, which is based, solely, on speculation. Ms. Dronet’s unrefuted testimony, describing the August 2001 accident and her report to her superiors; her effort to see Dr. Bernauer on the day this incident occurred; her untainted credibility; and the medical evidence, indicating an aggravation of her preexisting injuries, sufficiently demonstrate that she met her | ¡¡.burden of proving the existence of a second accident and reinjury; thus, beginning a new prescriptive period.[1]
Injury
In August of 2001, Ms. Dronet informed her employer that she reinjured her right hand while “mopping the floors” with an “industrial sized mop” at the E-Z Mart store she managed. She emphasized the awkward nature of the mop by stating: “I’m not talking about a mop we mop our house with. I am talking about an industrial-sized mop, and they’re very hard to handle.”
According to her testimony, the “extreme pain” she experienced the day of the subject incident was markedly different from the pain she had been living with for years. She gave the following testimony:
I have had pain since I have had my surgeries. But that day that I hurt my hand with that mop ... it looked like just a bolt of lightening went through my hand, and it hurted me, and ever since then the hand is progressively getting worse, you know. It is not getting any better.
(Emphasis added.) When Ms. Dronet was asked whether her hand had gotten any better after her two surgeries, on November 5, 1998 and June 10, 1999, she responded:
Before I had my surgery [my hands] hurted [sic] me. They hurted [sic] me so bad I couldn’t hardly do anything. Then after I had ... the two surgeries ... I went back to work and I was able to perform my job better than I was before I had my surgeries. And then after August [of 2001] ... I just steady started declining. I mean, it got to the point where I couldn’t do anything.
In addition, she was asked if she told anybody about her injury on the day of the second accident, which was unwitnessed. *1217 She answered: “Yes, my assistant manager, and I contacted my supervisor.” Ms. Dronet remembered telling them: “I hurt-ed [sic] my hand, you know. It was hurting, and it went up into where the incision was, and it went up into the arm and stuff.”
|a“In evaluating the evidence, the uncon-tradicted testimony of a witness should be accepted as true, even if she is a party, in the absence of circumstances casting suspicion on the reliability of her testimony.”[2] Co-workers, spouses, friends, or medical evidence may provide corroboration of the claimant’s testimony.[3]
Proof of an accident must be by preponderance of the evidence, and a claimant’s testimony alone may be sufficient to discharge this burden, provided two elements are satisfied. First, no other evidence must discredit or cast serious doubt upon the claimant’s version of the incident, and second, his testimony must be corroborated by circumstances following the alleged incident.[4]
Mrs. Dronet’s employer and insurer did not refute her testimony that she suffered a second “accident” and reinju-ry or her recollection that she reported this incident to her assistant manager and supervisor when it happened. Instead, they decided not to call Jeanne Holi-field, her supervisor, as a witness at trial, even though they initially indicated that they intended to do so.
Another important piece of evidence supporting Ms. Dronet’s contention of re-injury is that soon after the accident and before her regularly scheduled appointments, Ms. Dronet “called for an appointment” with Dr. Bernauer, but he “couldn’t see [her] before [her] scheduled appointment.” She further recalled: “I told [his office] that I had injured my hand again because of the work that I do.” (Emphasis added.)
Fireman’s Fund Insurance, E-Z Mart, and the majority highlight that Dr. Ber-nauer’s medical records from this examination, on August 27, 2001, do not mention any new work-related event that aggravated her injury. They believe this is a significant circumstance that casts suspicion on her testimony. However, there could be many reasons for this lack of a reference to Ms. Dronet’s alleged accident. For example, it could have simply been an oversight or the doctor might not have |4thought about it as being important since his concern was a medical, rather than a legal one. Thus, the inference the majority garnered, by the absence from the medical records of a notation of reinjury, that no aggravation of her injury took place, is clearly unfounded.
Importantly, the record viewed as a whole corroborates Ms. Dronet’s testimony, and what one should conclude from her August 27th visit, the first visit following her reinjury, is that Dr. Bernauer’s dimin-ishment of her work status must have been because of a substantial change in her functionality. Specifically, he ordered a “work excuse,” diminishing the number of hours she could work from forty-eight to twenty per week.
Moreover, further indicia of reinjury is that all of her physicians took escalated actions after this visit, in response to her changed condition.
*1218 On November 8, 2001, approximately two months after the subject accident, Dr. Rand Metoyer examined Ms. Dronet. He concluded that she was suffering from “bilateral hand pain” and “major depression.” His report gives some insight into her credibility and the extent of her disability after reinjury:
[Ms. Dronet] appears to be a stoic individual, however, when questioned about suicidal thoughts she began to break down and look very tearful. She has a very hard time dealing with the pain. She states that she cannot commit suicide due to her family.
A few days later, on November 19, 2001, Dr. Bernauer examined her at her regularly scheduled appointment, upon which, he determined that she was in need of “pain management.”
On December 6, 2001, Dr. Metoyer performed a right stellate ganglion block to relieve her “chronic right wrist and hand pain.”
Nevertheless, on January 21, 2002, she told Dr. Bernauer that “the pain remained.” Responding, he noted: “She is having some problems at work. She does do paper work and work with a computer.... At this time, I am giving the patient a work excuse.” Therefore, he recommended that she no longer work as a manager for E-Z Mart.
Dr. Bernauer further corroborated her testimony when he acknowledged: “It is my opinion that [Ms. Dronet’s] employment as a cashier did aggravate her condition.” (Emphasis added.)
1 ^Therefore, a significant number of references in the record and in the medical notations clearly supports that this second accident aggravated, accelerated, or combined with Ms. Dronet’s preexisting infirmities and created a reasonable possibility of a causal connection between the accident and [her] present condition.[5]
Accordingly, the majority’s affirmation of the WCJ’s determination that Ms. Dro-net failed to prove, by a preponderance of the evidence, the occurrence of a sudden identifiable work-related event in August of 2001 is manifestly erroneous.
PRESCRIPTION
Ms. Dronet filed the subject claim on February 15, 2002. On its face, it states that the date of her injury was September 14, 1998. She received her last TTD payment in July of 1999. Thus, any claim for compensation benefits, arising from her injury of September 14, 1998, would have been filed well past a year from the receipt of her last compensation payment for TTD.
“Generally, the party pleading prescription on a workers’ compensation claim bears the burden of proof on the issue.”[6] However, where the claimant’s petition has clearly prescribed on its face, the burden shifts to the claimant to prove that the prescriptive period was interrupted or suspended.[7]
Ms. Dronet has not asserted any circumstances that could have interrupted or suspended prescription on a claim to recover compensation benefits for her September 14, 1998 injury. Nevertheless, the WCJ erred in ruling that her actual claim had prescribed, since the unrefuted evidence shows that it arose from a separate sudden *1219 identifiable work-related event that occurred in August of 2001.
Although September 14, 1998 is listed on Ms. Dronet’s claim form as the date of her second injury, the facts establish that, while she still suffered pain from the original injury, her condition had stabilized until she reinjured her right hand in August of 2001. Immediately afterwards, she felt a different and more “extreme pain,” evidencing that this reinjury was due to an identifiable incident — mopping with | (¡an industrial mop. Moreover, her attorney acknowledged that he inadvertently put the date of her first injury on the claim form.
This work-related accident established a new prescriptive period for receipt of TTDs.
Prescriptive statutes are to be construed in favor of maintaining rather than barring actions. Consistent with that precept, Louisiana Code of Civil Procedure Article 1153 should be applied liberally and without undue restriction by technical rules. This is especially true in workers’ compensation cases.[8]
“The fundamental purpose of prescription statutes is only to afford a defendant economic and psychological security if no claim is made timely, and to protect [her] from stale claims and from the loss of non-preservation of relevant proof.”[9]
These statutes protect a party against lack of notification of a formal claim within the prescriptive period.[10] Therefore, if the original timely filed pleading gives a party actual notice that the opponent is making a formal claim based on a particular factual situation, no essential purpose of the prescriptive statutes is violated.[11]
Ms. Dronet’s claim for TTDs satisfied this legal requirement, thus, it has not prescribed.
Temporary Total Disability Benefits
An employee, seeking TTDs has the burden of proving by clear and convincing evidence, unaided by any presumption of disability, that she is physically incapable of engaging in any type of employment.[12] “To prove a matter by clear and convincing [7evidence means to demonstrate that the existence of a disputed fact is highly probable; that is, much more probable than its nonexistence.”[13]
The objective medical evidence overwhelmingly supports Ms. Dronet’s unrefut-ed testimony that she feels “extreme pain” in her hand. In addition, there is no evidence suggesting she exaggerated the severity of her symptoms.
Clearly, after her January 21, 2002 examination, Dr. Bernauer believed her disability to be so severe that it rendered her incapable of working as a manager for EZ Mart. There is no reason to doubt this assessment of her condition. Therefore, Ms. Dronet proved by clear and convincing evidence that she is unable to engage in substantial employment.
Penalties and Attorney’s Fees
Ms. Dronet prayed for statutory penalties and attorney’s fees for the Appellees’ failure to pay TTDs.[14] However, when they *1220 initially denied benefits, it was reasonable for them to believe that her complaints in August of 2001 were neither new nor an aggravation of a preexisting injury. As such, they were reasonable in controverting her claim for TTDs. Therefore, I would find that Ms. Dronet is not entitled to penalties nor attorney’s fees.

. See Tate v. Cabot Corp., 01-1652 (La.App. 3 Cir. 7/3/02), 824 So.2d 456, writ denied, 02-2150 (La. 11/22/02), 829 So.2d 1044.

. Howell v. Serv. Merch. Co., 95-79, p. 5 (La. App. 3 Cir. 8/9/95) 663 So.2d 96, 98 (citing Hopes v. Domtar Indus., 627 So.2d 676 (La. App. 3 Cir. 1993)).

. Tate, 824 So.2d at 463 (citing Bruno v. Harbert Intern. Inc., 593 So.2d 357 (La.1992); Honeycutt v. Elbert Walker Constr., 01-1291 (La.App. 3 Cir. 2/6/02), 815 So.2d 1011).

. Id. at 463.

. See Id.

. Duplechain v. DOTD, 02-356, p. 3 (La.App. 3 Cir. 10/2/02), 827 So.2d 567, 568, writ denied, 02-2674 (La. 1/31/03), 836 So.2d 68 (citing Richardson v. Tyson Foods, 01-427 (La. App. 3 Cir. 10/3/01), 796 So.2d 827).

. Richardson v. Tyson Foods, 01-427 (La.App. 3 Cir. 10/3/01), 796 So.2d 827.

. Baker v. Conagra Broiler Co., 93-1230, pp. 7-8 (La.App. 3 Cir. 5/4/94), 640 So.2d 494, 497, writ denied, 94-1435 (La.9/23/94), 642 So.2d 1289 (citations omitted).

. Id. at 497.

. Id.

. Id.

. Rideaux v. Franklin Nursing Home, 95-240 (La.App. 3 Cir. 11/22/95), 664 So.2d 750, writ denied, 95-3093 (La.2/16/96), 667 So.2d 1058; La.R.S. 23:1221(1)(c).

. Id. at 754.

.La.R.S. 23:1201.